**Carl Post, OSB No. 061058**
carlpost@lawofficeofdanielsnyder.com
**John D. Burgess, OSB No. 106498**
johnburgess@lawofficeofdanielsnyder.com
**LAW OFFICES OF DANIEL SNYDER**
1000 S.W. Broadway, Suite 2400
Portland, Oregon 97205
Telephone: (503) 241-3617
Facsimile: (503) 241-2249

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| **CHRISTOPHER CALDWELL, SHANNON CLARK, JACEY HOPPERT, ALEX KULAKEVICH, JOSHUA KRUMWEIDE, DAVID LARUE, ALEXEI LAWLER, ANTHONY MATHIS, RAUL MARQUEZ, LUIS NAVARRETE, VALENTINE PASCU, ANDREW PIERSON, CHRISTOPHER PITMAN, TRACY RASBERRY, JEFF ROBERTS, CHRISTOPHER SELIGER, ANTHONY TAYLOR,** and **MARK WICKLUND**, individually and on behalf of those similarly situated, | Case No. 3:21-cv-501-AA <br><br> **PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> **ORAL ARGUMENT REQUESTED** |
| Plaintiff, | |
| v. | |
| **MULTNOMAH COUNTY**, a political subdivision of the state of Oregon; **MICHAEL REESE**, Multnomah County Sheriff, **STEVEN ALEXANDER**, Chief Deputy of Corrections, **KURTISS MORRISON**, Facility Commander, **JEFFERY WHEELER**, Facility Commander, and **DEPUTY CASTRO-RAMOS** | |
| Defendants. | |

# TABLE OF CONTENTS

LOCAL RULE 7-1 CERTIFICATION ................................................................................. 1

MOTION ................................................................................................................................. 1

MEMORANDUM OF LAW ................................................................................................... 2

I.    INTRODUCTION ............................................................................................................ 2

II.    FACTUAL BACKGROUND ......................................................................................... 4

   A.  Masks Become ODOC's Primary Control Mechanism ........................................... 5

   B.  Defendants' Failures Endanger and Cause Harm to Plaintiffs and Class Members ............ 7

   C.  Plaintiffs' experiences ............................................................................................. 9

      1.  Plaintiff Caldwell ............................................................................................ 9

      2.  Plaintiff Clark ................................................................................................ 10

      3.  Plaintiff Hoppert ........................................................................................... 11

      4.  Plaintiff Kulakevich ...................................................................................... 11

      5.  Plaintiff Krumweide ...................................................................................... 12

      6.  Plaintiff Larue ................................................................................................ 13

      7.  Plaintiff Mathis .............................................................................................. 14

      8.  Plaintiff Navarrete ......................................................................................... 14

      9.  Plaintiff Pascu ................................................................................................ 15

     10.  Plaintiff Pierson ............................................................................................. 17

     11.  Plaintiff Pitman .............................................................................................. 17

     12.  Plaintiff Rasberry .......................................................................................... 18

     13.  Plaintiff Roberts ............................................................................................ 19

     14.  Plaintiff Taylor .............................................................................................. 19

     15.  Plaintiff Wicklund ......................................................................................... 20

III.   ARGUMENT ................................................................................................................ 21

   A.  The Rule 23(a) Factors Are Satisfied .................................................................... 22

      1.  Numerosity ..................................................................................................... 22

      2.  Commonality .................................................................................................. 23

      3.  Typicality ....................................................................................................... 26

      4.  Adequacy ....................................................................................................... 28

   B.  The Rule 23(b)(3) requirements are met ............................................................... 30

      1.  Predominance ................................................................................................. 31

      2.  Superiority ...................................................................................................... 32

IV.   CONCLUSION ............................................................................................................. 35

## LOCAL RULE 7-1 CERTIFICATION

Pursuant to Local Rule 7-1, counsel for Plaintiffs certifies that they conferred telephonically with counsel for Defendants on the issues raised in this motion. Defendants do not consent to this motion.

## MOTION

Plaintiffs respectfully move for an order from this Court certifying Plaintiffs' proposed Damages Class pursuant to Federal Rule of Civil Procedure ("Rule") 23(b)(3). Plaintiffs' proposed Damages Class includes all adults incarcerated in the Multnomah County Detention Center (MCDC) and Multnomah County Inverness Jail (MCIJ), operated by the Multnomah County Sheriff's Office (MCSO), who: (1) were incarcerated on or after February 1, 2020; (2) while incarcerated, tested positive or were otherwise diagnosed with COVID-19; and (3) if they became incarcerated after February 1, 2020, tested positive or were otherwise diagnosed with COVID-19 at least 14 days after they entered MCSO custody. This district recently certified a federal class action alleging similar claims in *Maney et al. v. Brown et al.*, Case No. 6:20-cv-00570-SB. *See Maney v. State*, No. 6:20-cv-00570-SB, 2022 U.S. Dist. LEXIS 61930, 2022 WL 986580, at *26 (D. Or. Apr. 1, 2022) (granting the plaintiffs' motion for class certification and defining the "Damages Class" as "[a]ll adults incarcerated in [ODOC] facilities who: (1) were incarcerated on or after February 1, 2020; (2) while incarcerated, tested positive or were otherwise diagnosed with COVID-19; and (3) if they became incarcerated after February 1, 2020, tested positive or were otherwise diagnosed with COVID-19 at least fourteen days after they entered Oregon Department of Corrections custody").

Plaintiffs further seek an order from the Court appointing Plaintiffs Caldwell, Clark, Hoppert, Kulakevich, Krumweide, Larue, Mathis, Navarrete, Pascu, Pierson, Pitman, Rasberry,

Roberts, Taylor, and Wicklund as representatives of the Damages Class, appointing counsel of record as class counsel, and providing court-approved notice to members of the Damages Class. This motion is supported by the following memorandum of law and several declarations filed concurrently herewith.

MEMORANDUM OF LAW

## I.    INTRODUCTION

Plaintiffs are, or were, adults in custody (AIC) of the Multnomah County Inverness Jail (MCIJ) or Multnomah County Detention Center (MCDC). Plaintiffs, individually and on behalf of all others similarly situated, bring claims arising from Defendants failure to protect AICs from contracting the novel coronavirus COVID-19. Each Plaintiff contracted COVID-19 due to the deliberate indifference or negligence by Defendants. Defendants willfully disregarded standard safety guidelines, refused to take preventative measures, denied AIC proper testing and treatment, and knowingly comingled infected AICs or guards with non-infected AICs.

This is a class action alleging civil rights and negligence claims against the Multnomah County and Defendants Michael Reese, Multnomah County Sheriff;[1] Steven Alexander, Chief Deputy of Corrections; Kurtiss Morrison, Facility Commander; Jeffery Wheeler, Facility Commander; and Deputy Castro-Ramos ("Defendants") for the willful, deliberately indifferent, and/or negligent care afforded to AICs in the custody of the Multnomah County Sherriff's Office (MCSO), and Defendants' failure to protect those AICs from heightened exposure to a serious communicable disease—specifically, COVID-19. Through January 31, 2023, Defendants have reported that over 600 inmates in their custody have tested positive for COVID-19. COVID-19 spread throughout Defendants' facilities because Defendants did not take sufficient steps to

---

[1] Titles are from the time the lawsuit was filed and may no longer be accurate.

implement and enforce masking, social distancing, and quarantining as mechanisms to prevent
spread of the virus and prevent harm to AICs in their custody.

Federal Rule of Civil Procedure ("Rule") 23 provides a tool to manage the volume and
chaos of the 600 injury claims that flow from Defendants' wrongful conduct. Class treatment
pursuant to Rule 23 is particularly appropriate here given the number of questions of fact and
law that are common among those 600 cases. A predominant common question, for instance, is
whether Defendants in this case—who created and maintained a centralized structure to
coordinate and oversee the pandemic response, and who have complete control over the
environment in which individuals are imprisoned—acted with deliberate indifference to the
health and safety of inmates in their custody when they failed to enforce mask mandates, failed
to implement and enforce social distancing, and failed to otherwise protect AICs in their
custody against a heightened exposure to a serious, easily communicable, and deadly disease—
COVID-19.

Certification of Plaintiffs' proposed Damages Class is appropriate. It will allow this
Court to resolve common factual and legal questions with respect to approximately 600[2] class
members, avoiding the need to address such questions thousands of times through thousands of
individual lawsuits. Plaintiffs therefore respectfully request that the Court issue an order
certifying the Damages Class, appointing Plaintiffs as representatives of their respective class,
and appointing Carl Post and John Burgess as class counsel.

---

[2] See Post Dec., ¶ 2. "The court has issued an order (Dkt. 15) requiring defendants to disclose a list of each person
who was in custody of the Multnomah County Inverness Jail or Detention Center and was tested for COVID-19 or
diagnosed with COVID-19. In response, defendants have identified approximately 600 adults in custody who tested
positive for COVID-19 while in custody through January 31, 2023. Some individuals tested positive more than
once."

PAGE 3 – PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## II.    FACTUAL BACKGROUND

MCDC and MCIJ houses pretrial detainees and persons convicted of crimes. The County is obligated by state and federal law to provide for the health and safety of all persons lodged in the Inverness and to provide medical and mental health care for the same. FAC[3] ¶ 13; Ans.[4] ¶ 11.

COVID-19 can be spread from person to person through respiratory droplets, contact with contaminated objects or surfaces, and by being in close personal contact with anyone infected with the virus. Measures for reducing the spread of the illness were maintaining at least six feet of distance between people, frequent hygiene including hand washing, cleaning and disinfecting touched surfaces (such as phones, handles, trays, tables, etc.), and covering one's mouth and nose with a mask. Since the beginning of the pandemic, COVID-19 has spread particularly effectively in environments such as nursing homes, prisons, and jails. FAC ¶ 14; Ans. ¶ 12. Multnomah County agrees there is a "potential disproportionate impact of such a highly transmissible virus on people in custody."[5]

Defendants' response to the COVID-19 pandemic was woefully inadequate. The following trend is alarming and illuminates defendants' negligence and deliberate indifference:

a.   On December 21, 2020, the first AIC at Inverness had a positive COVID-19 test result. On December 23, 2020, another AIC tested positive.[6]

b.   As of February 2, 2021, 107 adults in custody tested positive for COVID-19.[7]

c.   As of February 10, 2021, 145 adults in custody tested positive for COVID-19 and

---

[3] First Amended Class Action Complaint. Dkt 8.
[4] Amended Answer to Amended Complaint. Dkt. 17.
[5] *Id.*
[6] https://multco.us/multnomah-county/news/adults-custody-test-positive-covid-19
[7] https://multco.us/multnomah-county/news/update-covid-19-cases-inverness-jail

94 individuals remained in isolation.[8]

d. As of February 12, 2021, 172 adults in custody tested positive for COVID-19.[9]

e. As of February 17, 2021, 192 adults in custody at Inverness have tested positive for COVID-19. Another 29 staff members, or members of their households, have also tested positive.[10]

To put these numbers in in context, at the time Inverness housed about 512[11] AICs and therefore, as of February 17, 2021, 37.5% of AICs in Inverness custody have tested positive for COVID-19. By contrast, as of February 19, 2021, Oregonians overall contracted COVID at a rate of 3.5%.

Defendants' failure to require, or enforce, social distancing, PPE, increased testing, or other precautions in jails and jails known to slow the spread of COVID-19 placed plaintiffs at imminent risk of contracting COVID-19.

**A. Masks Become ODOC's Primary Control Mechanism**

Requiring that face coverings be worn in the jails is a critical part of the plan to decrease exposure to COVID-19 and to contain any outbreak, should one occur. Staff that come and go from the facilities are one of the greatest risks for introduction of COVID-19 into the jails. The Sheriff has revised the direction about wearing masks over time:

a. In early April 2020, the Sheriff issued a recommendation for all staff to wear masks when within 6 feet of each other, per CDC guidance.

b. On June 24, 2020, the Sheriff issued a face covering policy consistent with the

---

[8] https://multco.us/multnomah-county/news/inverness-jail-outbreak-increases-local-state-health-officials-review#:~:text=As%20of%20Feb.%2010%2C%20145,There%20have%20been%20no%20deaths
[9] https://multco.us/multnomah-county/news/update-covid-19-cases-inverness-jail-0
[10] https://multco.us/multnomah-county/news/update-covid-19-outbreak-inverness-jail
[11] https://multco.us/multnomah-county/news/update-covid-19-cases-inverness-jail

Governor and County Chair's direction for the use of face coverings – mandating

face coverings in all jail settings because physical distancing can be difficult.

c.   On August 6, 2020, the Sheriff upgraded the policy to the level of a special order

mandating the use of face coverings. The distinction between policy and special

order is important because a special order allows for staff members to be

disciplined for noncompliance.[12]

In fall 2020, Multnomah County Auditor's Office sent a survey to all county employees to provide them with an opportunity to communicate their experiences during the pandemic. More than 50% of MCSO staff in the jails who responded to the survey reported that County employees wear face coverings only sometimes or rarely. Of the 458 MCSO staff members that work in the jail, 216 responded to this question. Staff reported that some of their coworkers were not taking COVID-19 seriously and not complying with face covering requirements.[13]

Despite the extremely high noncompliance with the special order mandating face coverings, as of October 23, 2020, MCSO reported that they had not disciplined any staff for non-compliance with the face covering order.[14] Similarly, 75% of MCSO staff in the jails who responded to the survey reported that AIC's wear face coverings only sometimes or rarely. Not wearing masks placed plaintiffs at immediate risk of harm by spread of COVID-19. Indeed, because inmates were not allowed public visitors,[15] only inmates that were not properly screened and tested prior to entry or jail staff could have spread COVID-19 to plaintiffs.

Instead of using KN-95 or similar masks recommended for the public, the MCSO used

---

[12] Multnomah County Auditor's Office Audit of Multnomah County's Pandemic Response February 2020 pp. 17-18. Available https://multco.us/file/95008/download.
[13] *Id.* at 17.
[14] *Id.* at 18
[15] https://multco.us/multnomah-county/news/update-covid-19-cases-inverness-jail

washable cloth face coverings for both adults in custody and staff. Adults in custody could exchange their mask for a clean one once a week. This contrasts with CDC guidelines, which call for cloth face coverings to be washed when dirty, but at least every day if used.[16]

### B. Defendants' Failures Endanger and Cause Harm to Plaintiffs and Class Members

Instead of being proactive to protect Plaintiffs, Defendants only act when told to do so. For example, on January 15, an adult in custody at Inverness tested positive for COVID-19. Only after being advised by county Public Health staff, Corrections Health performed testing of those exposed to identify newly infected individuals. This quickly revealed 81 additional individuals in multiple dorms that tested positive.[17] On January 21, again per public health recommendations, a second round of testing was performed, identifying another eleven adults that tested positive for COVID-19.[18]

Defendants failed to properly utilize the testing available to prevent the COVID-19 outbreak at Inverness. At a minimum, corrections health was capable of performing at least 120 tests per day."[19] In other words, defendants could easily test approximately 25 percent of the adults in custody per day to identify AICs that have contracted COVID-19 and stop the spread. Every four days the entire AICs population could have been tested.

Despite this capability, rapid testing was only used 194 times in 2020.[20] Corrections Health has increased the use of rapid testing in 2021 at the direction of Public Health Staff.[21] In

---

[16] Id at 19.

[17] https://multco.us/multnomah-county/news/corrections-health-continues-monitor-covid-19-cases-inverness-jail-0

[18] https://multco.us/multnomah-county/news/corrections-health-continues-monitor-covid-19-cases-inverness-jail

[19] https://multco.us/multnomah-county/news/public-and-corrections-health-brief-board-amidst-sharp-decline-covid-19-cases

[20] https://multco.us/multnomah-county/news/public-and-corrections-health-brief-board-amidst-sharp-decline-covid-19-cases

[21] https://multco.us/multnomah-county/news/corrections-health-continues-monitor-covid-19-cases-inverness-jail-0

the first two and a half months of 2021, Corrections Health completed 900 tests.[22]

Multnomah County Public Health declared the COVID-19 outbreak at Inverness Jail at an end on March 23. The determination came after 28 days passed — or two full incubation periods for the virus — without a new case.[23] From December 2020 through March 23, 2021, 198 adults in custody and 31 corrections staff or members of their households tested positive.[24]

Regrettably, defendants continued to fail to protect inmates and another outbreak occurred at both the Multnomah County Detention Center and Inverness Jail. Beginning in early May 2021, several adults in custody had tested positive for COVID-19 at both the Multnomah County Detention Center and Inverness Jail.[25] Corrections Health began repeat testing of potentially exposed adults in custody after an adult in custody who had symptoms of COVID-19 tested positive for the virus on May 6 at the Detention Center. Since then, a total of 12 adults in custody at that location have tested positive. [26]

As of May 7, 2021, Corrections Health reports an adult in custody at the Multnomah County Detention Center who had symptoms of COVID-19 tested positive for the virus on May 6. Rapid testing of potentially exposed adults in custody turned up an additional three cases on May 7. Because of transfers between facilities, two dorms at Inverness Jail were considered exposed and quarantined.[27] As of May 17, 2021, Corrections Health reported four adults in custody at the Multnomah County Detention Center had tested positive for COVID-19 on May 9. Rapid testing of potentially exposed adults in custody turned up the five cases since May 6.[28]

---

[22] https://multco.us/multnomah-county/news/public-and-corrections-health-brief-board-amidst-sharp-decline-covid-19-cases
[23] https://www.multco.us/multnomah-county/news/inverness-jail-outbreak-ends-vaccinations-continue
[24] Id.
[25] https://www.multco.us/multnomah-county/news/update-new-covid-19-cases-county-detention
[26] *Id.*
[27] https://www.multco.us/multnomah-county/news/four-custody-test-positive-covid-19
[28] https://www.multco.us/multnomah-county/news/four-adults-custody-tests-positive-covid-19

As of May 25, 2021, seven new cases of COVID-19 were discovered at the Multnomah County Detention Center and five new cases at the Inverness Jail. Corrections Health only began repeat testing of potentially exposed adults in custody after an adult in custody who had symptoms of COVID-19 tested positive for the virus on May 6 at the Detention Center. Testing began at one dorm at Inverness Jail after an adult in custody tested positive for the virus on May 24.[29] As of June 8, 2021, 12 inmates at the Detention Center tested positive since May 6, 2021 and 23 inmates tested positive at Inverness.[30] Again, this demonstrates defendants reactionary steps instead of proactive steps at preventing the spread of the virus.

Through January 31, 2023, Defendants have reported that over 600 inmates in their custody have tested positive for COVID-19. The parties agreed to limit per-certification discovery of positive tests through that date.

**C. Plaintiffs' experiences**

**1. Plaintiff Caldwell**

Plaintiff Caldwell is currently incarcerated at Snake River Correctional Institution. He was booked at Multnomah County Detention Center and transferred to Multnomah County Inverness Jail on October 31, 2019. He remained there until November 8, 2020, when he was transferred back to MCDC. On August 11, 2021, he was transferred back to MCIJ. On August 26, 2021, he was admitted to Snake River Correctional Institution. Caldwell Decl., ¶ 5.

While incarcerated at MCDC and MCIJ, Caldwell observed jail staff consistently not wearing masks, downplaying COVID-19, not following CDC guidelines such as social distancing, and placing infected and quarantined inmates in his dorm. He was also placed in cells

---

[29] https://www.multco.us/multnomah-county/news/testing-finds-multiple-covid-19-cases-detention-centers
[30] https://www.multco.us/multnomah-county/news/update-new-covid-19-cases-county-detention

with infected inmates and worked around infected inmates. Caldwell Decl., ¶ 8.

Caldwell tested positive for COVID-19 on May 7, 2021. See Ex. 2. He was exposed to COVID-19 at MCDC after an infected inmate was placed in the cell above him. The ventilation system connects all the cells together, so the air coming in his cell came directly from the inmate above him then to himself. The inmate above him had also written a kyte about a week prior to this stating he had COVID-19 symptoms. Caldwell also experienced the worst migraines that would take everything out of him. Caldwell Decl., ¶ 9.

### 2. **Plaintiff Clark**

Plaintiff Clark was booked at Multnomah County Detention Center on October 10, 2020. On November 2, 2020, he was transferred to Multnomah County Inverness Jail. Clark Decl., ¶ 4. He was recently released. Clark tested positive for COVID-19 on February 9, 2021. On May 5, 2021, he believed he was exposed to COVID-19 again. He requested a COVID-19 test and was denied. A few hours later it was confirmed that his dorm was exposed to COVID-19 again and he was eventually tested. Clark Decl., ¶ 5. On November 10, 2022, Clark was diagnosed with Long COVID-19. On November 20, 2022, he tested positive again for COVID-19. Clark Decl., ¶ 6.

While incarcerated at MCIJ and MCDC, Clark was very concerned about a lack of social distancing, inadequate masking and PPE provided, people who have tested positive for COVID-19 being allowed into the dorms, and CDC protocol violations in the kitchen and dorms. Days before he was re-exposed to COVID-19, on May 4, 2021, Correctional Officer McClure would repeatedly enter the dorms without a mask, take his mask off while talking to AICs, or not wear a mask entirely. Clark did not feel protected or safe while at MCIJ and MCDC. Additionally, on June 6, 2022, he witnessed Officer Kessinger take away a KN-95 mask from an inmate, claiming

it was unauthorized. Clark Decl., ¶ 7.

### 3. Plaintiff Hoppert.

Hoppert was booked at Multnomah County Detention Center on January 23, 2021. On February 6, 2021, he was transferred to Multnomah County Inverness Jail. On June 28, 2021, he was released. On April 6, 2023, he was booked at OSCI and he is currently incarcerated at Powder River Correctional Facility. Hoppert Decl., ¶ 5.

Hoppert tested positive for COVID-19 on June 1, 2021. On June 2, 2021, he was placed in Dorm 17 for 9 days, which is a segregation unit or the "hole," where he was kept in a cell for 21 hours a day and had his privileges taken away such as phone use, showers, and recreational activities. He was in Dorm 17 while he was contagious with COVID-19 and there were people in that dorm who did not have COVID-19 at the time. Hoppert Decl., ¶ 8.

While incarcerated at MCIJ, Deputy Kessinger would come into their bunk areas and touch everything and would move people around in the unit randomly. Several guards would take off their masks while inmates would ask them questions, some didn't even wear gloves, and none of them enforced social distancing. While incarcerated at MCDC and MCIJ, Hoppert observed jail staff consistently not wearing masks, downplaying COVID-19, not following CDC guidelines such as social distancing. Hoppert Decl., ¶ 9.

### 4. Plaintiff Kulakevich

Plaintiff Kulakevich was booked at Multnomah County Detention Center on November 5, 2020. He was transferred to Multnomah County Inverness Jail on November 12, 2020. He was released on February 17, 2021. See Ex. 1 (001009). Kulakevich Decl., ¶ 3. He tested positive for COVID-19 on February 8, 2021. *Id.* at ¶ 4.

### 5. **Plaintiff Krumweide**

On October 24, 2019, Plaintiff Krumwiede was booked at Multnomah County Detention Center and then transferred to Multnomah County Inverness Jail. He was housed there until July 26, 2020, when he was transferred back to MCDC until August 3, 2020. On August 3, 2020, he was transferred back to Multnomah County Inverness Jail.  On May 20, 2021, Krumwiede was transferred to Sheridan. He is currently incarcerated at Victorville Medium II FCI. Krumwiede Decl., ¶ 5.

Krumwiede tested positive for COVID-19 on January 21, 2021. On January 13, 2021, Plaintiff Wicklund was transferred downtown for court and was placed in a holding cell with approximately ten quarantined AICs for several hours. Wicklund was then transported to Inverness with the AICs in quarantine. Upon arrival it was announced that eleven new AICs arrived. After about a half-hour they realized Wicklund was not a new AIC, potentially exposed to COVID-19, and should not have been with the other ten AICs. Wicklund was then moved to another holding cell with two other AICs that were not on quarantine, potentially exposing them to COVID-19. Instead of quarantining Wicklund, he was placed back into dorm 10, the dorm Krumwiede was in, exposing all of the healthy AICs to COVID-19. On January 15, 2021, Wicklund began experiencing symptoms and ultimately tested positive for COVID-19. Krumwiede was tested on January 16, 2021, and was negative, but he began experiencing symptoms around January 18, 2021. After testing positive on January 21, 2021, Krumwiede was moved to Dorm 18 where he laid on a bed choking and coughing up blood. Krumwiede was also experiencing immense pressure in his head behind his eyes, blurred vision, and fogginess. Krumwiede was scared for his life and was spitting up blood before being taken to OHSU. Krumwiede's medical records show that he spent 5 days coughing up blood, along with chest

pain, shortness of breath, and abdominal pain due to the coughing. Krumwiede Decl., ¶ 8.

While incarcerated at MCIJ, medical staff would come into their units taking oxygen levels and temperatures from inmates without wiping their instruments between inmates. Right before one of the COVID-19 outbreaks, a good number of officers would walk around the unit with their face masks around their necks, more like a collar than a face mask. Additionally, they would only offer AICs clean masks once a week, and at no point had there been any social distancing. The masks they were provided were made from cloth. Krumwiede Decl., ¶ 9.

### 6. Plaintiff Larue

Plaintiff Larue was booked at Multnomah County Detention Center on June 24, 2020. He was transferred to Multnomah County Inverness Jail on July 9, 2020. He was released around July 2022. LaRue Decl., ¶ 5.

LaRue tested positive for COVID-19 on January 26, 2021. He was exposed because a federal inmate was being housed in the unit he was in, Dorm 10, after being transported with people quarantining for COVID-19 and placed in holding tank with them for over 4 hours. The deputies realized their mistake, but instead of quarantining the federal inmate they let him into Dorm 10. He was removed on January 15, 2021, and tested positive for COVID-19. LaRue Decl., ¶ 8.

While incarcerated at MCIJ, not a lot was done to protect inmates from COVID-19. Inmates did not social distance, they did not sleep 6 feet apart, it did not seem like they followed any CDC or Governor of Oregon's guidelines. Sheriff Michael Reese did not have their health or welfare in mind, and did not follow procedures put in place to protect inmates. They only got one cotton mask and it was exchanged once every week. Deputies consistently took off their masks and prioritized protecting themselves better than protecting the inmates. They downplayed the

pandemic and tried to take away their yard and shower time. LaRue Decl., ¶ 9.

### 7.  Plaintiff Mathis

Plaintiff Mathis is currently incarcerated at Eastern Oregon Correctional Institution. He was booked at Multnomah County Detention Center on February 18, 2020. He was transferred to Multnomah County Inverness Jail on February 23, 2020, and back to MCDC on July 19, 2020. On October 1, 2020, he was transferred back to MCIJ until he was released on August 17, 2021. He was released, and then he was admitted to EOCI on August 25, 2021. Mathis Decl., ¶ 5.

He tested positive for COVID-19 on January 25, 2021. He was exposed on Dorm 10. He still experiences loss of taste and smell, shortness of breath, and coughing along with his previous asthma that has worsened since COVID-19. Additionally, on April 14, 2021, Elaine Marcus, MD wrote Mathis a letter telling him that he most likely had Long COVID. Mathis Decl., ¶ 8.

While incarcerated at MCIJ, jail staff failed to treat COVID-19 adequately. Medical staff was not sanitizing the finger oxygen reader in between inmates, they brought other dorm's pizzas in the quarantine dorm to deliver, and the jail staff was clearly unprepared. They only provided one cloth mask per week and no other PPE for inmates to protect themselves. They failed to isolate quarantined inmates by mixing them with other non-quarantined inmates. They did not properly clear inmates to be released from quarantine or allow us to socially distance themselves during meals or sleeping arrangements. They were overpopulated in open dorms based on CDC standards, and Correctional Officers would continuously downplay COVID-19. Mathis Decl., ¶ 9.

### 8.  Plaintiff Navarrete

Plaintiff Navarrete is currently incarcerated at Snake River Correctional Institution. He

was booked at Multnomah County Detention Center on January 9, 2020. On January 10, 2020, he was transferred to Multnomah County Inverness Jail until he was released on June 30, 2021. Navarrete Decl., ¶ 7.

Navarrete tested positive for COVID-19 on January 28, 2021. He was housed with AICs that reported COVID-19 symptoms for several days that the jail staff failed to quarantine. Multiple symptoms were reported by inmates Lancey and Harris on January 28, 2021, and staff finally tested those inmates that morning. However, they were not removed from Dorm 12 until roughly 2:00 pm that day. Navarrete Decl., ¶ 8.

While incarcerated at MCIJ, AICs did not receive proper PPE and social distancing was not imposed in dorms, kitchens, hallways, and court transportations or holding cells. Jail staff would consistently not wear masks and make statements downplaying COVID-19. Navarrete Decl., ¶ 14.

**9.  Plaintiff Pascu**

He was booked at Multnomah County Detention Center on November 3, 2020. On November 10, 2020, he was transported to Multnomah County Inverness Jail until he was released on May 28, 2021. See Ex. 1. He was admitted to Snake River Correctional Institution on January 12, 2022, and he is currently incarcerated at Snake River Correctional Institution. Pascu Decl., ¶ 5,

He tested positive for COVID-19 on February 7, 2021. See Ex. 2. He was housed in Dorm 7 which was under quarantine in late January to early February. On February 3, 2021, despite being under quarantine, he was transported to Dorm 11 on orders from Deputy Allen and Deputy Hampton, which was not under quarantine. Pascu was then moved back to Dorm 7 on February 6, 2021. He tested positive the next day and was moved to Dorm 12. On February 16,

2021, he was transferred to Dorm 18, and the next day on February 17, 2021, he was moved to Dorm 11 and experienced backlash, criticism, and ostracism because he potentially spread COVID-19 to other AICs and he felt threatened. An inmate was moved into Dorm 11 during this time when he did not have COVID-19. From February 3, 2021, to February 22, 2021 Pascu was forced to move 5 times within the facility from non-COVID-19 affected, non-quarantined, non-locked down units where no one had COVID-19 or COVID-19 symptoms to units which were affected, quarantined, and locked down due to COVID-19. There was a deliberate indifference, negligence, and reckless behavior demonstrated by jail staff towards Pascu and others from MCDC and MCIJ. Pascu Decl., ¶ 8.

While incarcerated at MCIJ, Pascu witnessed Aramark workers, deputies, and sergeants not following face mask state mandates, and had witnessed arguments between inmates and deputies about the validity of COVID-19 itself. There was a rumor that Aramark workers Ms. Heather, Ms. Dora, Ms. Kelly, and Mr. Dave were exposed to COVID-19, yet were still allowed to work in Inverness Jail's kitchen. In these arguments, inmates were made to look like fools for asking for facemask policies to be followed and respected, and one time even be denied a facemask. At times Pascu, among others, were engaged in these debates while being dressed down/strip-searched and deputies would try to convince them that COVID-19 itself was a "hoax" that "the media had blown out of proportion." Pascu has been housed in units and dorms in which social distancing state mandates were broken, denied, or neglected. Units in which often six people were crammed into and forced to reside in cubicles that were 150 to 200 square feet. He witnessed deputies consistently neglecting face mask regulations, specifically Deputy Vetter. Pascu Decl., ¶ 9.

**10. Plaintiff Pierson**

Plaintiff Pierson was booked at Multnomah County Detention Center on August 11, 2020. On August 18, 2020, he was transferred on to Multnomah County Inverness Jail. On April 27, 2021, he transferred to MCDC and was released. See Ex 1. He is currently incarcerated at Columbia River Correctional Institution. Pierson Decl., ¶ 7.

He tested positive for COVID-19 on February 8, 2021. He was housed in dorm 7, the kitchen worker dorm. Kitchen workers were told there was no need to wear masks in the kitchen. There was no mandate to wear masks in the kitchen after December 2020. The masks that were provided were thin fabric, flimsy, and often fell off. Since the masks were often damaged or rendered ineffective, guards told inmates we did not have to wear them. Additionally, the guards did not wear masks in the kitchen. The gloves provided to kitchen workers were also flimsy, easily damaged, and often fell off. Consequently, many AICs did not wear gloves and were not required to do so. Kitchen workers touched the food, drink containers, cutlery, and trays of inmates and transported food around the jail. The carts and kitchen materials were not disinfected between uses. Aramark kitchen workers contracted COVID-19 and reported to work and worked around AICs in the kitchen. Pierson Decl., ¶ 8.

While incarcerated at MCIJ, he observed jail staff not wearing proper PPE, including gloves and masks. The staff did not impose social distancing in dorms, kitchens, hallways, court transportation, or holding cells. While working in the kitchen, he was not required to wear a mask in Dorm 7, kitchen, or back and forth to the kitchen. When he was brought to medical, he was not required to wear a mask. Pierson Decl., ¶ 9.

**11. Plaintiff Pitman**

Plaintiff Pitman was booked at Multnomah County Detention Center on December 22,

2020, and transferred to Multnomah County Inverness Jail on January 7, 2021. On March 25, 2021, he was transferred back to MCDC. On April 9, 2021, he was released until he was rebooked at MCDC on June 26, 2021. He was last released in February 2023. Pitman Decl., ¶ 4.

Pitman tested positive for COVID-19 on February 8, 2021. This was in between his first vaccination shot on February 2, 2021, and second shot on February 23, 2021. He was exposed in Dorm 7, the kitchen worker dorm. Pitman Decl., ¶ 5.

While incarcerated at MCIJ and MCDC, the jail staff were too slow to test for COVID-19 amidst an obvious COVID-19 outbreak in the kitchen workers dorm 7. The kitchen was the main culprit for the rapid spread of COVID-19. On February 5, 2021, we were told before our P.M. Kitchen shift that we weren't required to wear masks while working. During his shift as a cook and handling ready-to-eat trays, workers did not wear a mask and they were given inadequate PPE while working and walking to and from the dorms to the kitchen. On February 8, 2021, after Dorm 7 got tested, the P.M. kitchen crew was forced to continue working knowing that they potentially contracted COVID-19. Additionally, the proper sanitation of carts and containers was neglected, medical staff were rude, and they made it extremely difficult to get proper medication. Pitman Decl., ¶ 6.

### 12. Plaintiff Rasberry

Plaintiff Rasberry was booked at Multnomah County Detention Center on April 16, 2020. He was transported to Multnomah County Inverness Jail on April 23, 2020. He was then transported back to MCDC on June 10, 2021, and then back to MCIJ again on July 21, 2021. He is currently at MCIJ. Rasberry Decl., ¶ 4.

Rasberry first reported COVID-19 symptoms July 15, 2020. He had shortness of breath, tight chest, woke up feverish, had a decreased appetite and an increase in fatigue, and had a mild

loss of smell. He tested positive for COVID-19 on February 8, 2021. Rasberry Decl., ¶ 5.

While incarcerated at MCIJ, the jail staff continuously housed inmates in open dorms instead of cells and put non-COVID-19 people next door to COVID-19 positive people. Additionally, Rasberry witnessed Deputy D. Caston refuse to wear a mask on multiple occasions. Some guards would also refuse to take the vaccine. In Dorm 11, there was a riot because the jail staff were not testing the dorm and inmates called them out on their actions, which resulted in jail staff tasing someone who wanted to take a test. Rasberry Decl., ¶ 12.

### 13. Plaintiff Roberts

Plaintiff Roberts was booked at Multnomah County Detention Center on November 23, 2020. He was transferred to Multnomah County Inverness Jail on December 1, 2021. He was transferred back to MCDC on April 2, 2021, until he was released on May 7, 2021. Roberts Decl., ¶ 5

While incarcerated at MCIJ, he witnessed staff refusing to allow inmates to take showers except for certain hours. They also forced inmates, including himself, to stand in lines directly next to infected inmates and made him sleep within six feet of six infected inmates against his protest. Roberts Decl., ¶ 6

On January 28, 2021, he tested negative for COVID-19 and the jail staff refused to take his situation seriously. Even though he was experiencing symptoms since he tested negative, they refused to move him to quarantine. He experienced ongoing migraines and blurry vision. He tested positive for COVID-19 on January 29, 2021. Roberts Decl., ¶ 7

### 14. Plaintiff Taylor

On or about January 7, 2020, Taylor was incarcerated at Multnomah County Inverness Jail. Taylor Decl., ¶ 7. On February 8, 2021, he tested positive for COVID-19. See Ex. 1. Taylor

PAGE 19 – PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Decl., ¶ 8.

While at MCIJ, he worked in the hallways as a cart pusher. He was handling garbage that had been infected with COVID-19 and he was not given proper PPE. While working in the hallways, the mask he was told to wear was made from cloth. Taylor Decl., ¶ 9.

While incarcerated at MCIJ, the jail staff did not impose proper PPE or social distancing. Some of the jail staff did not wear masks until the beginning of July in 2020. The inmates were not required to wear masks throughout the jail until mid-November of 2020. Taylor Decl., ¶ 10.

**15. Plaintiff Wicklund**

He was booked at Multnomah County Detention Center on June 16, 2020. He was transferred to Multnomah County Inverness Jail on June 23, 2020. On July 31, 2021, he was transferred back to MCDC. He was released in late 2021 or early 2022. Wicklund Decl., ¶ 7.

He tested positive for COVID-19 on January 15, 2021. He was booked into MCDC on June 16, 2020. On January 13, 2021, he was transferred downtown for court and was placed in a holding cell with approximately ten quarantined AICs for several hours. He was then transported back to Inverness with the AICs on quarantine. Upon arrival it was announced that eleven new AICs arrived. After about a half-hour they realized he was not a new AIC, potentially exposed to COVID-19, and should not have been with the other ten AICs. He was then moved to another holding cell with two other AICs that were not on quarantine, potentially exposing them to COVID-19. Instead of quarantining Wicklund, he was placed back into dorm 10 with healthy AICs, thereby exposing the AICs to COVID-19. On January 15, 2021, he began experiencing symptoms and ultimately tested positive for COVID-19. He was transferred to D1808 (medical) on January 15, 2021, D0417 then D0432 on January 22, 2021, and then back to D1021 on January 27, 2021. Wicklund Decl., ¶ 8.

While incarcerated at MCIJ, he witnessed captains, counselors, and deputies come into

units not wearing masks and touching stuff, as well as medical staff not sanitizing equipment in

between inmates receiving medical care. Correctional Officer Gravsted and Sargent Scott failed

to keep him safe in the transport holding cell coming back from court as well. Sargent Boardsly

and Correctional Officer Kessinger also downplayed his experience and mistreated him along

with other inmates. The jail captains and doctors refused inmates fresh air, and the showers were

only on twice a day for short periods of time. Wicklund Decl., ¶ 12.

## III.    ARGUMENT

"A class action may be maintained if Rule 23(a) is satisfied and if" one of the three

categories in Rule 23(b) is satisfied. Fed. Rule Civ. Proc. 23(b); *Shady Grove Orthopedic*

*Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398, 130 S. Ct. 1431, 1437 (2010). "By its terms

this creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue

his claim as a class action." Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 559 U.S.

393, 398, 130 S. Ct. 1431, 1437 (2010). The decision to bring a class action resides in the

plaintiff if Rule 23 is satisfied. *Id.*

The district court must perform a "rigorous analysis" to ensure that the requisite

requirements for certification are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51, 131

S. Ct. 2541 (2011). This analysis may "entail some overlap with the merits of the plaintiff's

underlying claim." *Id*. However, "Rule 23 grants courts no license to engage in free-ranging

merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S.

455, 466, 133 S. Ct. 1184, 1194 (2013). "Merits questions may be considered to the extent—but

only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for

class certification are satisfied." *Id.* The plaintiff's burden of establishing that the prerequisites of

Rule 23 are satisfied by a preponderance of the evidence. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022).

Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) or 23(c)(4), on behalf of themselves and on behalf of all others similarly situated. Plaintiffs seek damages on behalf of all AICs who have been in custody of MCSO and have tested positive for COVID-19.

### A.  The Rule 23(a) Factors Are Satisfied

Rule 23(a) restricts class actions to cases where:

> (1) the class is so numerous that joinder of all members is impracticable;

> (2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These requirements are more commonly referred to as numerosity, commonality, typicality, and adequacy of representation, respectively. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.1998). Each of these requirements are met in this case.

### 1.  Numerosity

"The prerequisite of numerosity is discharged if 'the class is so large that joinder of all members is impracticable.'" *Hanlon*, 150 F.3d at 1019 (quoting Fed. R. Civ. P. 23(a)(1)). "'[I]mpracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class." *Franco-Gonzales v. Napolitano*, 2011 WL 11705815, at *6 (C.D. Cal. Nov. 21, 2011) (quoting *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913–14 (9th Cir. 1964)). "[W]here a class is large in numbers, joinder will usually be

impracticable. *Jordan v. Cnty. Of L.A.*, 669 F.2d 1311, 1319 (9th Cir. 1982) (citing 3B Moore's

Federal Practice P 23.05(1) (2d ed. 1974)).

Most courts, including courts in the Ninth Circuit and this district, presume numerosity

where the proposed class contains 40 or more members. *See Jordan v. Los Angeles Cty.*, 669

F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds by* 459 U.S. 810 (1982)(inclined to

find the numerosity requirement satisfied solely on the basis of 39 ascertained class members);

*Giles v. St. Charles Health Sys., Inc.*, 294 F.R.D. 585, 590 (D. Or. 2013)(as a rule of thumb, 40

member is sufficient to satisfy numerosity requirement); *see also McKenzie Law Firm, P.A. v.

Ruby Receptionists, Inc.,* No. 3:18-cv-1921-SI, 2020 U.S. Dist. LEXIS 72904, at *11 (D. Or.

Apr. 24, 2020) (same); *Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris,

Inc.*, 188 F.R.D. 365, 373 (D. Or. 1998) (rule of thumb is 40; therefore, 50 class members is

sufficient to presume joinder of the class members is impracticable without reference to the other

factors identified in *Jordan.*).

Plaintiff's proposed Class readily satisfies Rule 23(a)'s numerosity requirement. The

Class has more than 600 members.

## 2. Commonality

For commonality, "[w]hat matters to class certification… is not the raising of common

'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate

common *answers* apt to drive the resolution of the litigation." *Parsons v. Ryan*, 754 F.3d 657,

675 (9th Cir. 2014) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541

(2011) (italics in original). "[F]or purposes of Rule 23(a)(2) even a single common question will

do." *Wal-Mart*, 564 U.S. at 359 (citation and formatting omitted); *Mazza v. Am. Honda Motor

Co., Inc*., 666 F.3d 581, 589 (9th Cir. 2012) (noting that "commonality only requires a single

significant question of law or fact"). "Where the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012) (quoting *Parra v. Bashas', Inc.*, 536 F.3d 975, 978-79 (9th Cir. 2008)). "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon*, 150 F.3d at 1019.

Wal-Mart explicitly recognized that a broad challenge to specific policies or practices affecting all putative class members generally meets the commonality requirement. For example, the Supreme Court explained that "if [an] employer 'used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements of Rule 23(a).'" *Wal-Mart*, 131 S. Ct. at 2553. Where Plaintiffs challenge facility-wide practices that affect all of the putative class members, they too satisfy these requirements.

Any minor factual differences among members of the class do not undermine commonality. *See Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (rejecting defendant's argument that class was improperly certified in prison case alleging several forms of systemic disability discrimination and stating that "individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality"). *Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010) is instructive on this point. In *Rodriguez*, the plaintiff sought certification of a class of individuals held in immigration detention in California for more than six months without a hearing. *Rodriguez*, 591 F.3d at 1111. The Ninth Circuit rejected the argument that class certification should be denied because each individuals' case turned on

"divergent questions of statutory interpretation and consideration of different factual circumstances," finding that "the commonality requirement asks us to look only for some shared legal issue or a common core of facts." *Id*. at 1122.

The extensive factual record in this case makes clear that there are questions of law or fact common to the class that predominate over any questions affecting only individual members, including, but not limited to, whether defendants:

    a.  failed to require adequate social distancing;

    b.  failed to require AICs, staff, or agents to wear masks or other PPE;

    c.  failed to quarantine COVID-infected AICs from uninfected AICs;

    d.  placed AICs that were symptomatic or who had tested positive with COVID in confined spaces, such as cells, workspaces, and transportation vehicles, with AICs that had not been infected with COVID-19;

    e.  required AICs that were housed in quarantine units (with COVID-19 positive AICs) to work, eat, serve food, and otherwise interact in person with AICs from nonquarantine units;

    f.  failed to quarantine AICs with COVID symptoms or awaiting testing or test results from uninfected AICs;

    g.  allowed corrections staff with known COVID-19 symptoms to work in the institutions;

    h.  failed to properly sanitize and disinfect facilities, equipment, and commonly touched surfaces such as telephones, tablets, and door handles;

    i.  failed to screen or take necessary steps to prevent employees or other people that were symptomatic or had been exposed to COVID from entering a facility;

    j.  failed to test symptomatic AICS;

    k.  failed to contact trace to identify people who were exposed to AICS or staff that tested positive;

    l.  failed to test people who were exposed to AICS or staff that tested positive; and

    m.  failed to screen or test AIC transfers, employees, and other people entering a facility for symptoms or exposure.

Each of those common questions raises a host of additional common questions, including admissibility of evidence, testimony, and applicable standards of proof. And any one of those common legal or factual issues, standing alone, is enough to satisfy Rule 23(a)(2)'s permissive standard. *See Inland Empire—Immigrant Youth Collective v. Nielsen*, 2018 WL 1061408, at *8 (C.D. Cal. Feb. 26, 2018) (citing *Perez-Olano v. Gonzalez*, 248 F.R.D. 248, 257 (C.D. Cal.

2008)); *Caput v. NTT Security US Inc.*, 2019 WL 3308771, at *2 (C.D. Cal. Apr. 19, 2019) ("For the commonality requirement to be met, there must only be one single issue common to the proposed class." (quoting *Haley v. Medtronic*, 169 F.R.D. 643, 648 (C.D. Cal. 1996) (quotation marks and alterations omitted)). Plaintiffs' proposed classes readily meet the commonality requirement.

Plaintiff's proposed class readily satisfies the commonality requirement.

### 3. Typicality

To be certified as a class, either the claims or defenses of the representative parties must be typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal citations and quotations removed). "The commonality and typicality requirements of Rule 23(a) tend to merge." *Wal-Mart*, 131 S. Ct. at 2551 n.5. "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." 131 S. Ct. at 2551 n.5.

"Typicality refers to the nature of the claim or defense of the class representative" but "not to the specific facts from which it arose or the relief sought." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020.

To determine typicality, "the focus should be on the defendants' conduct and plaintiff's legal theory, not the injury caused to the plaintiff." *Lozano v. AT&T Wireless Servs.*, 504 F.3d 718, 734 (9th Cir. 2007) (emphasis added). Indeed, this Court has expressly held that, to establish typicality, "it is not necessary that all class members suffer the same injury as the class representative." *Id.* "The requirement of typicality is not primarily concerned with whether each person in a proposed class suffers the same type of damages; rather, it is sufficient for typicality if the plaintiff endured a course of conduct directed against the class." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir. 2017).

Plaintiffs' claims are the same or similar to the claims of the members of the proposed class; in other words, they are "reasonably co-extensive with those of absent class members" and therefore satisfy Rule 23(a)(3)'s typicality requirement. Notably, differing levels of injury do not defeat typicality—so long as the class representative's claim is similar to and arises from the same course of conduct as the unnamed class members' claims, typicality is satisfied. *Ramirez v. TransUnion, LLC*, 951 F.3d 1008, 1033 (9th Cir. 2020) (differences in severity of injuries does not defeat typicality), *cert. granted*, 141 S. Ct. 972 (2020); *see also Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) ("We do not insist that the named plaintiffs' injuries be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries resulted from the same, injurious course of conduct." (citing *Armstrong v. Davis*, 275 F.3d 849, 868–69 (9th Cir. 2001)).

Plaintiffs' claims are typical of the claims of the class because they all suffered from the same policies or practices alleged herein and seek the same type of relief. Plaintiffs' claims are typical of class members' claims in that:

a.  Plaintiffs were affected by the violations described above;

b.  Plaintiff's claims stem from the same practices and/or courses of conduct that form the basis of the claims;

c.  Plaintiff's claims are based upon the same legal and remedial theories as those of the class and involve similar factual circumstances; and

d.  Plaintiff's injuries are similar to the injuries which class members have suffered.

### 4.  Adequacy

Finally, Rule 23(a) requires "representative parties [who] will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To resolve the question of legal adequacy, the court must answer two questions: "(1) do the named plaintiff and his counsel have any conflicts of interest with other class members and (2) will the named plaintiff and his counsel vigorously prosecuted the action on behalf of the class?" *Hanlon*, 150 F.3d at 1020. This adequacy inquiry considers a number of factors, including "the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive." *Brown v. Ticor Title Ins.*, 982 F.2d 386, 390 (9th Cir.1992).

Plaintiffs will fairly and adequately protect the interests of the members of the proposed classes. Plaintiffs do not seek any unique or additional benefit from this litigation that may make their interests adverse to members of the Damages Class. They have no conflicts of interests with members of the proposed classes. Accordingly, Plaintiffs lack any antagonism with members of the class, and their interests align squarely with unnamed class members.[31]

Plaintiffs' counsel is aware of no conflicts of interest between themselves and members of the class. Post Decl., ¶ 4. The undersigned counsel has and will represent the class fairly,

---

[31] See Caldwell Decl., ¶¶ 2-4, 6-7; Clark Decl., ¶¶ 2-3; Hoppert Decl., ¶¶ 2-4, 6-7; Kulakevich Decl., ¶ 2; Krumweide Decl., ¶¶ 2-4, 6-7; Larue Decl., ¶¶ 2-4, 6-7; Mathis Decl., ¶¶ 2-4, 6-7; Navarrete Decl., ¶¶ 2-6; Pierson Decl., ¶¶ 2-6; Pitman Decl., ¶¶ 2-3; Rasberry Decl., ¶¶ 2-3; Roberts Decl., ¶¶ 2-4; Taylor Decl., ¶¶ 2-6; Wicklund Decl., ¶¶ 2-6.

adequately, and vigorously. *Id.* The Law Offices of Daniel Snyder and its lawyers are sufficiently qualified and experienced to conduct this litigation. Post Decl., ¶ 3. Class counsel has the experience, knowledge of applicable law, and resources required to vigorously represent the class. *Id.*; *see Jordan*, 669 F.2d at 1323 (9th Cir. 1982) (holding that adequacy of counsel can be met by showing that the named plaintiffs' attorneys are qualified, experienced, and generally able to conduct litigation).

The undersigned has experience handling cases with varied employment law, civil rights law, disability rights law, and medical malpractice claims. Post Decl., ¶ 3. Additionally, he has ample experience and knowledge of the legal and factual issues in this litigation. *Id*. Furthermore, he is representing several hundred inmates in two mass tort cases. *See* USDC Case Nos. 3:21-cv-00196-SB and 3:22-cv-00487-SB. *Id.*

Undersigned counsel also meets the requirements of Rule 23(g), and should therefore be appointed as class counsel. Fed. R. Civ. P. 23(g) ("a court that certifies a class must appoint class counsel"). Under the rule, in appointing class counsel, a court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." *Id*. Undersigned counsel has been heavily involved in the investigation and litigation of this matter since April 2021. Counsel also has extensive experience in handling complex litigation and federal practice, and has sufficient resources to vigorously prosecute this case. Therefore, the adequacy requirement of Rule 23(a)(4) is satisfied, Plaintiffs should be appointed as Class Representatives, and Plaintiffs' counsel should be appointed as Class Counsel.

**B.  The Rule 23(b)(3) requirements are met**

To maintain a damages class, Plaintiffs must establish that common questions of law or fact predominate over individual questions, and that a class is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). Certification pursuant to Rule 23(b)(3) "is appropriate 'whenever the actual interests of the parties can be served best by settling their differences in a single action.'" *Hanlon*, 150 F.3d at 1022 (quoting 7A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1777 (2d ed. 1986)).

Rule 23(b)(3) lists four nonexclusive factors "pertinent" to the court's review of the predominance and superiority criteria: (1) the interests of the class members in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in a particular forum; and (4) the likely difficulties in managing a class action. *Amchem Prods. v. Windsor*, 521 U.S. 591, 615, 117 S. Ct. 2231, 2246 (1997)(citing Fed. R. Civ. P. 23(b)(3)(A)–(D)). At bottom, predominance and superiority test whether the "proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem*, 521 U.S. at 623, such that adjudication by representation would be both fair and efficient. 7A Wright & Miller, Federal Practice & Procedure § 1779, at 174 (3d ed. 2005); *see also Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001)("A consideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis.").

### 1. Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623, 117 S. Ct. 2231, 2249 (1997)(citing 7A Wright & Miller, 518-519.)

Judicial economy and fairness are the focus of the predominance and superiority inquiry. *Or. Laborers- Employers Health & Welfare Trust Fund*, 188 F.R.D. at 375. The inquiry "presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2)" and "focuses on the relationship between the common and individual issues." *Hanlon*, 150 F.3d at 1022. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Id.* (quoting Wright & Miller, *supra*, § 1778).

"Predominance is not, however, a matter of nose-counting. Rather, more important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016) (internal citation omitted).

"When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453-54, 136 S. Ct. 1036, 1045 (2016)(quoting 7A Wright & Miller, Federal Practice and Procedure §1778, pp. 123-124 (3d ed. 2005)).

The predominance analysis takes into account questions of damages. *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017). "[P]laintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Leyva v. Medline Indus.*, 716 F.3d 510, 514 (9th Cir. 2013)(citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 133 S. Ct. 1426, 1435 (2013)). However, "damage calculations alone cannot defeat certification." *Id.* at 513.

In this case, the common questions that Plaintiff has identified present a significant aspect of Plaintiffs' case and most appropriately are resolved through a single, class-wide adjudication. Furthermore, judicial economy supports a finding of predominance. As explained above, the same liability and causation questions exist with respect to each of the claims for all members of the Class. Certification is appropriate.

### 2. Superiority

In addition to the predominance requirement, Rule 23(b)(3) provides a nonexhaustive list of matters pertinent to the court's determination that the class action device is superior to other methods of adjudication. Fed. R. Civ. P. 23(b)(3)(A)-(D). These matters include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action. *Id.* "A consideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (quoting 7A Wright & Miller,

Federal Practice and Procedure § 1780 at 562 (2d ed. 1986)).

### a.   the interests of the class members in individually controlling the prosecution of separate actions

The individual members of the proposed class have little or no interest in individually controlling the prosecution of this action. Where damages suffered by class members are not large, this factor weighs in favor of certification, *Zinser*, 253 F.3d at 1190 (citing *In re Dalkon Shield IUD Prods. Litig.*, 693 F.2d 847, 856 (9th Cir. 1982)), particularly when compared with the litigation costs or other barriers to pursuing individual claims, *In re Arizona Theranos, Inc. Litig.*, 2020 WL 5435299, at *9 (D. Ariz. Mar. 6, 2020).

Here, it is in the Class Member's best interest to litigate their claims in a single action. Individual actions would entail increased expenses, duplication of discovery, and a potential for inconsistent results. *See Phelps,* 261 F.R.D. at 563; *Morelock Enters. v. Weyerhaeuser Co.,* 2004 WL 2997526, *5 (D. Or. Dec. 16, 2004). Class Members would have "less litigation or settlement leverage, significantly reduced resources and no greater prospect for recovery" should they be required to individually litigate their claims. *Hanlon,* 150 F.3d at 1023. In fact, Class Members may likely forego pursuing claims, since their individual damages are relatively small compared to the cost of litigating in federal court or elsewhere.

### b.   the extent and nature of any litigation concerning the controversy already begun by or against class members

This factor "'is intended to serve the purpose of assuring judicial economy and reducing the possibility of multiple lawsuits. If the court finds that several other actions already are pending and that a clear threat of multiplicity and a risk of inconsistent adjudications actually exist, a class action may not be appropriate . . . .'" *Zinser*, 253 F.3d at 1191 (quoting 7A Wright & Miller, Federal Practice & Procedure § 1780, at 568–70. Plaintiffs are not aware of any other litigation that would create "a risk of inconsistent adjudications." For example, USDC Case No.

3:21-cv-00217-AA is stayed pending the resolution of class certification in this case. See Dkt.

15. To Plaintiffs' knowledge, there are no other class actions pending regarding the issues raised

in this lawsuit.

### c.   the desirability or undesirability of concentrating the litigation of the claims in a particular forum

It would be far more time consuming for each individual putative class member to seek

and compel discovery. For example, the employees of defendant would need to be deposed

numerous times regarding the same subject matter. Further, the parties would need to individually

retain experts and/or litigate damages issues. A class action is thus the most efficient and

economical approach for pursuing the claims at issue. *See Amchem Prods.,* 521 U.S. at 615, 117

S. Ct. 2231 (Fed. R. Civ. P. 23 exists to vindicate "the rights of groups of people who

individually would be without effective strength to bring their opponents into court at all"). For

these reasons, certification of the class action is appropriate.

### d.   the likely difficulties in managing a class action.

Class actions are superior "[p]articularly where damages can be computed according

to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact

that damages must be calculated on an individual basis is no impediment to class

certification." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259-60 (11th Cir. 2004). In *Leyva v.*

*Medline Indus*., 716 F.3d 510, 515 (9th Cir. 2013), the Ninth Circuit determined the "district

court incorrectly held that class certification was not the superior method of adjudication

because of the difficulty of managing the approximately 500-member class and determining

"the extent to which each putative class member lost wages, and, consequently, suffered

damages." The court noted that courts routinely certify larger and more complex classes. *Id.*

*See Ortega v. J.B. Hunt Transp., Inc.*, 258 F.R.D. 361, 364 (C.D. Cal. 2009) (certifying class

of "nearly 6,000" employees who alleged that their employer failed to pay minimum wages, provide proper meal and rest periods, provide accurate wage statements, or provide wages due upon termination); *Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 402 (C.D. Cal. 2008) (certifying class of 15,000 employees who alleged that their employer's policies violated state reporting time and split-shift regulations). Additionally, *Maney v. State*, No. 6:20-cv-00570-SB, 2022 U.S. Dist. LEXIS 61930, 2022 WL 986580 (D. Or. Apr. 1, 2022) certified a similar class action of at least 3600 prisoners.

Based on the foregoing, a class action is superior.

## IV.    CONCLUSION

This case is particularly appropriate for certification as a Damages Class under Rule 23(b)(3). The harm that class members suffered—COVID-19 infection—occurred in one system wholly under the centralized control of Defendants. The policies and practices that gave rise to Plaintiffs' injuries are common to the class. Liability can be resolved in a single proceeding. For those reasons, and for the further reasons explained above, Plaintiffs respectfully request that the Court enter an order certifying this case as a class action under Rule 23(b)(3) or Rule 23(c)(4), appointing Plaintiffs as class representatives of their class, and appointing undersigned counsel as class counsel.

DATED: January 22, 2024

LAW OFFICES OF DANIEL SNYDER

/s/ Carl Post
Carl Post, OSB No. 06105
carlpost@lawofficeofdanielsnyder.com
John D. Burgess, OSB No. 106498
johnburgess@lawofficeofdanielsnyder.com
Telephone: (503) 241-3617
Facsimile: (503) 241-2249
Attorneys for Plaintiff